## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

---

Kevin J. S.,                                        Case No. 22-cv-147 (NEB/TNL)

       Plaintiff,

v.                                                  **REPORT & RECOMMENDATION**

Kilolo Kijakazi,
Acting Commissioner of Social Security,

       Defendant.

---

James H. Greeman, Greeman Toomey, 250 Second Avenue South, Suite 120, Minneapolis, MN 55401 (for Plaintiff); and

James D. Sides, Social Security Administration, 6401 Security Boulevard, Office 4, Baltimore, MD 21235; and Ana H. Voss, United States Attorney's Office, 300 South Fourth Street, Suite 600, Minneapolis, MN 55415 (for Defendant).

---

### I. INTRODUCTION

Plaintiff Kevin J. S. brings the present case, contesting Defendant Commissioner of Social Security's denial of supplemental security income ("SSI") under Title XVI of the same, 42 U.S.C. § 1381 *et seq.*

This matter is before the undersigned United States Magistrate Judge on cross motions for summary judgment, Plaintiff's Motion for Summary Judgment, ECF No. 12, and the Commissioner's Motion for Summary Judgment, ECF No. 19. These motions have been referred to the undersigned for a report and recommendation to the district court, the Honorable Nancy E. Brasel, District Judge for the United States District Court for the District of Minnesota, under 28 U.S.C. § 636 and D. Minn. LR 72.1.

1

Based upon the record, memoranda, and proceedings herein, **IT IS HEREBY RECOMMENDED** that Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**, and the Commissioner's Motion for Summary Judgment, ECF No. 19, be **GRANTED**.

## II. PROCEDURAL HISTORY

On December 31, 2018, Plaintiff applied for SSI asserting that he has been disabled since November 2018 due to degenerative disc disease; chronic pain in neck and back; osteoarthritis in knees and legs; depression; spinal stenosis; anxiety; migraines; myofascial pain syndrome; and fibromyalgia  Tr. 15, 144, 162.  Plaintiff's application was denied initially and again upon reconsideration.  Tr. 15, 143-182.

Plaintiff appealed the reconsideration of his SSI determination by requesting a hearing before an administrative law judge ("ALJ").  Tr. 15, 201-03.  The ALJ held a hearing in April 2021, and issued an unfavorable decision.  Tr. 12-33.  After receiving an unfavorable decision from the ALJ, Plaintiff requested review from the Appeals Council, which was denied.  Tr. 1-7, 270-72.

Plaintiff then filed the instant action, challenging the ALJ's decision.  Compl., ECF No. 1.  The parties have filed cross motions for summary judgment.  ECF Nos. 12, 19. This matter is now fully briefed and ready for a determination on the papers.

## III. MEDICAL RECORDS

According to Plaintiff, his "assignments of error are limited to the ALJ's failure to properly consider his headache disorder."  Pl.'s Mem. in Supp. at 5, ECF No. 13.  Because

Plaintiff's headache-related impairment is the sole issue, the Court discusses only those medical records that relate to that impairment.

On June 14, 2017, Plaintiff saw Joshua M. Horowitz, DO, for neck pain, widespread pain, and headaches. Tr. 522-23. Plaintiff reported that the worst pain is in his neck and shoulders, the pain started about 25 years earlier, and the pain has worsened over the past month. Tr. 523. According to Plaintiff, on November 5, 2017, he went to the emergency room for pain and pressure in the left side of his head and was prescribed oxycodone. Tr. 498.

On March 21, 2018, Plaintiff saw Mary Jane Chiasson, DO, at the Noran Neurological Clinic for a neurological examination. Tr. 448. Among other issues, such as neck pain, lower back pain, shoulder pain, joint pain, depression, and anxiety, Plaintiff complained of "discomfort in his head," specifically, "headache, spinning or dizziness, [and] light headedness." Tr. 448-49. The neurological examination was normal and there was no evidence of any upper motor neuron or lower motor neuron abnormalities. Tr. 449. Dr. Chiasson opined that Plaintiff's chronic disabling pain was most likely orthopedic and related to degenerative joint disease and musculoskeletal disease. Tr. 450.

On May 31, 2018, Plaintiff saw physical therapist Timothy Binsfeld, DPT, for an initial physical therapy evaluation. Tr. 467. Plaintiff reported chronic cervical and lumbar pain, with the majority of pain in the center of his back. *Id*. Plaintiff reported headaches as an associated symptom. Tr. 468. Plaintiff then participated in physical therapy and discussed having a headache on several occasions. *See, e.g.,* Tr. 577 (reporting that he "again woke up with a headache this [morning]"); Tr. 579 (reporting "severe headaches

3

(about 3-5 days/week) mostly in the mornings starting at 3-4 am"); Tr. 637 (reporting a recent headache that lasted two days and a slight headache on this occasion); Tr. 639 (reporting a "significant headache" that brought him to the emergency room); Tr. 645 (reporting severe headaches 2-3 times per week lasting 12-24 hours and causing dizziness and light sensitivity); Tr. 652 (reporting a "flare up" of "disabling" headaches the last three days); Tr. 660 (reporting feeling a light headache starting a couple hours earlier); Tr. 666 (reporting a recent 18-hour headache); Tr. 673 (reporting constant headache symptoms); Tr. 675 (reporting having a headache for the entire day); Tr. 679 (reporting having increased headaches in the last few weeks); Tr. 686 (reporting that headaches have continued the last couple weeks); Tr. 695 (reporting a headache lasting 2-3 weeks); Tr. 706 (reporting increased headaches); Tr. 973 (reporting moderate headache); Tr. 1163 (reporting headaches). Plaintiff also discussed feeling some headache relief. *See, e.g.*, Tr. 681 (reporting having no headaches for four days); Tr. 686 (reporting headache pain decreased slightly); Tr. 693 (reporting no headaches in about a week); Tr. 702 (reporting no headaches since previous treatment session); Tr. 704 (reporting waking up with a headache but that it went away at about noon); Tr. 728 (reporting no headaches for five days); Tr. 982 (reporting no headaches for 10 days); Tr. 995 (reporting "significantly decreased" headaches with no headaches for 18 days); Tr. 1018 (reporting no headache); Tr. 1177 (reporting headaches feel better with recent physical therapy treatments).

Plaintiff also discussed his headaches with his primary care provider, Daniel Johnson, MD, among other providers. On July 8, 2019, Plaintiff reported three headaches per week where he develops neck pain with stiffness that radiates forward. Tr. 886. On

July 15, 2019, Plaintiff reported having headaches for about a year, over his bilateral forehead, at least 2-3 per week, which can last for over 18 hours.  Tr. 881.  He stated that he had 15 headache-free days per month.  *Id*.  He reported needing to go into a dark room to sleep off his headaches.  *Id*.  On December 17, 2019, Plaintiff reported increased headaches.  Tr. 871.  Dr. Johnson noted that Plaintiff's neck is stiff, and he has cervicogenic headaches.  *Id*.

In 2019, Plaintiff was also seen by doctors for depression and anxiety.  *See, e.g.*, Tr. 618, 623-24, 627, 631, 633.  Plaintiff discussed his headaches at several of these appointments.  For example, on October 19, 2019, he described his headaches as "debilitating."  Tr. 633.  On December 10, 2019, Plaintiff reported that he was having frequent headaches, seeing his primary care provider for headaches, and planning to start taking amitriptyline.[1]  Tr. 623-24.

In December 2019, Plaintiff went to urgent care for a headache.  Tr. 873.  Plaintiff reported that he has had a migraine for 12 hours and it is not going away.  *Id*.  He reported that he typically gets a migraine once a week.  *Id*.  The doctor noted that Plaintiff "has a history of headaches estimated at one time weekly lasting a duration of 1-2 days that he usually sleeps off."  *Id*.  The doctor also noted that Plaintiff was seen by pain management for headaches in July 2019 and it was recommended that he start a trial of nortriptyline,[2] but Plaintiff has not yet started the medication due to his concerns for possible adverse

---

[1] Amitriptyline is an antidepressant medication used to treat symptoms of depression.  It is also used to prevent migraine headaches.  *Amitriptyline*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682388 html (last accessed Jan. 23, 2023).

[2] Nortriptyline is an antidepressant medication used to treat depression.  *Nortriptyline*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682620.html (last accessed Jan. 23, 2023).

effects/addiction. *Id*. Plaintiff was instructed to go home and rest in a cool and dark room, apply an ice pack or drink some caffeine if desired, "try a baclofen[3] due to symptoms of back and neck pain which is likely contributed to his headache," use over-the-counter medications for headache management like Tylenol and ibuprofen, and start nortriptyline as previously prescribed. Tr. 875.

On February 26, 2020, Plaintiff went to urgent care complaining of a migraine headache, with pain at a nine out of ten intensity, pain over both temples, and some light sensitivity. Tr. 870. He stated that his neck pain had worsened and triggered his migraine. *Id*. He reported similar headaches five times per month, which often can be resolved with Tylenol and a cold pack. *Id*. The doctor noted that Plaintiff had an acute headache and gave him Toradol.[4] *Id*. The doctor instructed Plaintiff to take baclofen as a muscle relaxer and continue with rest and fluids. *Id*.

In 2020, Plaintiff was treated by several doctors for neck, back, and shoulder pain, among other issues. Specifically, on March 4, 2020, Plaintiff saw Artan Kaso, MD, for neck stiffness, low back pain, gait problems, recurrent falls, and shaking of the legs. Tr. 800. Dr. Kaso noted that Plaintiff has also complained of having chronic headaches "lately." *Id*. Plaintiff reported 4-5 ongoing severe migraines per month for the last three years. Tr. 801. Dr. Kaso concluded that Plaintiff has mild generalized osteoarthritis and chronic pain syndrome/fibromyalgia, which overwhelms the symptoms. Tr. 803. Dr. Kaso

---

[3] Baclofen is a muscle relaxant medication used to treat pain and muscle stiffness and tightness. It relieves pain and improves muscle movement. *Baclofen*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a682530 html (last accessed Jan. 23, 2023).

[4] Toradol is a brand name for ketorolac, an injection used to relieve pain. *Ketorolac Injection*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a614011.html (last accessed Jan. 23, 2023).

noted that headaches are a common symptom of fibromyalgia. Tr. 805-06. On March 17, 2020, Plaintiff saw Paul Rud, MD, for bilateral shoulder pain. Tr. 863. At that appointment, Plaintiff denied any headaches. *Id.*

Plaintiff also spoke with Dr. Johnson about his headaches in 2020. On March 4, 2020, Plaintiff reported that a Toradol injection improved a recent headache, and he had not had a headache in five days. Tr. 868. On May 6, 2020, Dr. Johnson noted that Plaintiff had cervicogenic headaches and planned to get an MRI for further evaluation. Tr. 859. Dr. Johnson also noted that Plaintiff saw pain management and it was recommended that he start nortriptyline, but Plaintiff decided against using the medication. Tr. 860.

In April and August 2020, Plaintiff saw Anh Nguyen, MD, at Brainerd Medical Clinic for Neurology. On April 13, 2020, Plaintiff reported having frequent headaches, specifically, 8-10 headaches per month for the last 4-5 years, which occur across the forehead, with pressure, exploding, associated with nausea, photophobia, phonophobia and blurred vision, with symptoms lasting up to two days. Tr. 861. Plaintiff reported that he tried nortriptyline, but it did not help. *Id.* Dr. Nguyen prescribed verapamil[5] for preventative therapy of migraine headaches. Tr. 862. For symptomatic treatment, Dr. Nguyen prescribed rizatriptan.[6] *Id.* Because Plaintiff was concerned he might have a brain tumor, Dr. Nguyen approved Plaintiff to undergo a brain MRI. *Id.* On August 3, 2020, Plaintiff saw Dr. Nguyen for a follow-up appointment. Tr. 1076. Plaintiff reported that

---

[5] Verapamil is a medication used to treat high blood pressure and to control chest pain. *Verapamil*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a684030.html (last accessed Jan. 23, 2023).

[6] Rizatriptan is a medication used to treat he symptoms of migraine headaches. It does not prevent migraine attacks or reduce the number of headaches a person has. *Rizatriptan*, MedlinePlus, Nat'l Lib. of Med., https://medlineplus.gov/druginfo/meds/a601109 html (last accessed Jan. 23, 2023).

the frequency of migraine headaches has not changed, about 8-10 times per month, but rizatriptan did help and his headaches last only six hours instead of two days. *Id*. Dr. Nguyen increased the dose of verapamil and instructed Plaintiff to stay on rizatriptan. Tr. 1077.

Plaintiff had some follow-up appointments for shoulder-related pain in 2021. On January 21, 2021, Plaintiff stated that he was in Florida for the next few months, has been doing exercises, and performing yoga. Tr. 1210. Plaintiff denied any headaches. *Id*. On May 26, 2021, Plaintiff reported that he had been taking rizatriptan for migraine relief and it has been effective. Tr. 104. On May 18, 2021, Plaintiff reported some improvement of his shoulder pain and denied any headaches. Tr. 110.

## IV. HEARING TESTIMONY

On April 22, 2021, Plaintiff appeared for a hearing before the ALJ. Plaintiff testified that the main thing preventing him from working was his "back is probably [the] number one" thing preventing him from working, and his "neck would be number two. . . . Just chronic back pain and neck pain and muscle spasms all the time." Tr. 122. He said that his "headache issues" also interfere with his ability to work. Tr. 123.

Plaintiff testified that he has seen a neurologist and is on some medication for his migraine headaches. *Id*. He reported getting about ten migraines per month, with four or five being severe, which last upwards of two days. Tr. 123, 131. He testified that he has an "enormous" sensitivity to light when he gets a migraine and has to shut his eyes. *Id*.

8

He testified that he cannot watch TV when he gets a migraine.[7] Tr. 131. Plaintiff testified that he would not be able to get through a shift at work if he had a severe migraine. *Id*.

At the hearing, Plaintiff also testified that on a typical day, he does "a lot of reading," talks to his children, tries to exercise, tries to sit on the floor and exercise to stretch out his stiffness, and watches television. Tr. 125. He testified that watching TV and reading take up most of his day. *Id*.

# V. ANALYSIS

## A. Legal Standard

Disability benefits are available to individuals who are determined to be under a disability. 42 U.S.C. § 1381a; *accord* 20 C.F.R. § 416.901. An individual is considered to be disabled if he is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(A); *accord* 20 C.F.R. § 416.905(a). This standard is met when a severe physical or mental impairment, or impairments, renders the individual unable to do his previous work or "any other kind of substantial gainful work which exists in the national economy" when taking into account his age, education, and work experience. 42 U.S.C. § 1382c(a)(3)(B); *accord* 20 C.F.R. § 416.905(a).

The ALJ determines disability according to a five-step, sequential evaluation process. 20 C.F.R. § 416.920(a)(4).

---

[7] In a work history report dated July 16, 2020, Plaintiff reported that he wears sunglasses to watch TV when he has a severe headache. Tr. 376.

> To determine disability, the ALJ follows the familiar five-step process, considering whether: (1) the claimant was employed; (2) []he was severely impaired; (3) h[is] impairment was, or was comparable to, a listed impairment; (4) []he could perform past relevant work; and if not, (5) whether []he could perform any other kind of work.

*Halverson v. Astrue*, 600 F.3d 922, 929 (8th Cir. 2010).  In general, the burden of proving the existence of disability lies with the claimant. 20 C.F.R. § 416.912(a).  In this evaluation process, the ALJ determines the claimant's residual functional capacity, which "is the most he can do despite his limitations."  20 C.F.R. § 416.945(a)(1); *see McCoy v. Astrue*, 648 F.3d 605, 614 (8th Cir. 2011) ("A claimant's [residual functional capacity] represents the most he can do despite the combined effects of all of his credible limitations and must be based on all credible evidence."); *see also, e.g.*, *Schmitt v. Kijakazi*, 27 F. 4th 1353, 1360 (8th Cir. 2022) (same).  "Because a claimant's [residual functional capacity] is a medical question, an ALJ's assessment of it must be supported by some medical evidence of the claimant's ability to function in the workplace."  *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F. 4th at 1360.

At the same time, the residual-functional-capacity determination "is a decision reserved to the agency such that it is neither delegated to medical professionals nor determined exclusively based on the contents of medical records."  *Norper v. Saul*, 964 F.3d 738, 744 (8th Cir. 2020); *see Perks*, 687 F.3d at 1092; *see also* 20 C.F.R. § 416.946(c).  "An ALJ determines a claimant's [residual functional capacity] based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of [his or her] limitations."  *Combs v. Berryhill*, 878

10

F.3d 642, 646 (8th Cir. 2017) (quotation omitted); *accord Schmitt*, 27 F. 4th at 1360; *Norper*, 964 F.3d at 744-45.  As such, there is no requirement that a residual-functional-capacity determination "be supported by a specific medical opinion." *Schmitt*, 27 F. 4th at 1360 (quotation omitted).    Nor is an ALJ "limited to considering medical evidence exclusively."    *Id.* (quotation omitted).    Accordingly, "[e]ven though the [residual-functional-capacity] assessment draws from medical sources for support, it is ultimately an administrative determination reserved to the Commissioner."  *Perks*, 687 F.3d at 1092 (quotation omitted); *accord Schmitt*, 27 F. 4th at 1360; *see* 20 C.F.R. § 416.946(c).

Judicial review of the Commissioner's denial of benefits is limited to determining whether substantial evidence on the record as a whole supports the decision, or if the ALJ's decision resulted from an error of law.  *Nash v. Comm'r, Soc. Sec. Administration*, 907 F.3d 1086, 1089 (8th Cir. 2018) (citing *Chismarich v. Berryhill*, 888 F.3d 978, 979 (8th Cir. 2018)).  The Court reviews whether the ALJ's decision is supported by substantial evidence in the record as a whole.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "[T]he threshold for such evidentiary sufficiency is not high."  *Id.*  "It means—and means only—such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Id.* (quotation omitted); *see, e.g.*, *Chismarich*, 888 F.3d at 979 (defining "substantial evidence as less than a preponderance but enough that a reasonable mind would find it adequate to support the conclusion" (quotation omitted)).

This standard requires the Court to "consider both evidence that detracts from the [ALJ's] decision and evidence that supports it."  *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011); *see Grindley v. Kijakazi*, 9 F.4th 622, 627 (8th Cir. 2021).  The ALJ's

decision "will not [be] reverse[d] simply because some evidence supports a conclusion other than that reached by the ALJ." *Boettcher*, 652 F.3d at 863; *accord Grindley*, 9 F.4th at 627; *Perks v. Astrue*, 687 F.3d 1086, 1091 (8th Cir. 2012). "The court must affirm the [ALJ's] decision if it is supported by substantial evidence on the record as a whole." *Chaney v. Colvin*, 812 F.3d 672, 676 (8th Cir. 2016) (quotation omitted). Thus, "[i]f, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perks*, 687 F.3d at 1091 (quotation omitted); *accord Chaney*, 812 F.3d at 676.

### B. ALJ's Decision

In this case, the ALJ followed the five-step sequential evaluation process for determining disability for SSI. At step one, the ALJ found that Plaintiff had not engaged in substantial gainful activity since his alleged disability onset date of December 31, 2018. Tr. 17. At step two, the ALJ found that Plaintiff had the following severe impairments: degenerative disc disease of the cervical spine and lumbar spine; fibromyalgia; osteoarthritis; impingement syndrome of the right shoulder; major depressive disorder; generalized anxiety disorder; and adjustment disorder. Tr. 17-18. At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or equaled a listed impairment in 20 C.F.R. pt. 404, subpt. P, app.1. Tr. 18-21. The

ALJ then found that Plaintiff had the residual functional capacity to perform light work[8] with additional limitations as follows:

> [H]e is able to lift and/or carry up to 10 pounds frequently and 20 pounds occasionally. He can sit about 6 hours in an 8-hour day with normal breaks. He can stand and/or walk about 6 hours in an 8-hour day with normal breaks. He should never climb ladders, ropers, or scaffolds. He can only occasionally climb stairs or ramps, reach overhead, balance as defined in the Selected Characteristics of Occupations, stoop, kneel, crouch, or crawl. He can tolerate only occasional exposure to work around vibration or hazards such as dangerous moving machinery and unprotected heights. [He] is able to understand, remember and carry out short, simple instructions. He is able to interact appropriately with coworkers and the general public on an occasional basis. He is able to maintain attention and concentration for routine work for 2-hour segments. He is able to respond appropriately to work pressures in a usual work setting. He is able to respond appropriately to changes in a routine work setting.

Tr. 21.

At step four, the ALJ found that Plaintiff was unable to perform past relevant work as an underground utilities installer.  Tr. 26.  At step five, however, the ALJ found that Plaintiff was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.  Tr. 26-27.  Specifically, based on Plaintiff's age, education, work experience, residual functional capacity, and the testimony of the

---

[8] As set forth in the regulations,

> [l]ight work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.

20 C.F.R. § 416.967(b).

vocational expert, the ALJ found that Plaintiff was capable of making a successful adjustment to the representative occupations of a merchandise marker, routing clerk, or mail clerk. Tr. 27. Accordingly, the ALJ concluded that Plaintiff was not under disability. *Id*.

### C. Headache Disorder

Plaintiff argues that he "consistently and frequently reported of largely treatment-resistant, hours-long headaches occurring multiple times per month." Pl.'s Mem. in Supp. at 8. Plaintiff contends that the ALJ failed to properly consider Plaintiff's headache disorder in the five-step sequential evaluation: (1) as a severe impairment at step two of the analysis; (2) as "equal" to the closest analogous listing at step three of the analysis; and (3) in the residual-functional-capacity determination. *Id*. at 8-9. Plaintiff argues that the Court should remand the case "for a full and fair evaluation of [his] severe headache disorder." *Id*. at 9.

#### a. Step Two Analysis

First, Plaintiff contends that the ALJ erred by failing to identify his headache disorder as a severe impairment at step two of her analysis. *Id*. at 12-14. Plaintiff argues that his headache disorder is supported by sufficient medical evidence and should have been identified as a severe impairment by the ALJ. *Id*. at 14.

At step two, the ALJ determines whether the SSI claimant has an impairment, or a combination of impairments, that is "severe." 20 C.F.R. § 416.920(c). The impairment, or a combination of impairments, is severe only if it "significantly limits [the claimant's] physical or mental ability to do basic work activities." *Id*. Thus, "[a]n impairment is not

severe if it amounts only to a slight abnormality that would not significantly limit the claimant's physical or mental ability to do basic work activities." *Kirby v. Astrue*, 500 F.3d 705, 707 (8th Cir. 2007). A claimant's "age, education, and work experience" are not relevant to the step two analysis. *See* 20 C.F.R. § 416.920(c). Instead, "medical evidence alone is evaluated in order to assess the effects of the impairment(s) on ability to do basic work activities." *Amy L. v. Saul*, No. 18-cv-2173 (HB), 2019 WL 4600262, at *2 (D. Minn. Sept. 23, 2019) (citation omitted). While the requirement of severity is "not a toothless standard," it is also not an "onerous requirement." *Kirby*, 500 F.3d at 707. Further, though it is Plaintiff's burden to prove that migraines are a severe impairment, the burden "at this stage of the analysis is not great." *See Caviness v. Massanari*, 250 F.3d 603, 605 (8th Cir. 2001).

At step two, the ALJ found that Plaintiff's migraines were not a severe impairment:

> Plaintiff alleges migraines as a severe impairment. He testified he has approximately 10 headaches a month with 4 or 5 being severe that can last up to 2 days. While he reported headaches to his providers, he has been reluctant to treat them with prescribed medication (Exhibits B8F, p. 10; B9F, p. 24, 31). He had urgent care for a headache for which he received Toradol, but he conceded he usually treats his headaches with Tylenol or a cold pack (Exhibit B17F, p. 17). Ultimately, he followed neurology and reported relief with physical therapy, muscle relaxer, or Rizatriptan (Exhibits B9F, p. 37; B17F, p. 15; B25F, p. 20). Overall, this suggests the frequency and duration is not consistent with his allegations. Thus, it does not have more than minimal limit [sic] [Plaintiff's] ability to perform basic work activities. It is not a severe impairment.

Tr. 17-18. The Court finds that the ALJ gave specific and sufficient reasons for finding that Plaintiff's migraines are not severe. The ALJ specifically considered Plaintiff's

migraines and determined they were not a severe impairment based upon the medical evidence. As the ALJ found, Plaintiff's migraines are not "severe" because they do "not significantly limit [Plaintiff's] physical or mental ability to do basic work activities." *See Kirby*, 500 F.3d at 707. Citing medical records, the ALJ reasoned that Plaintiff's migraines were being managed generally through conservative treatment, such as taking Tylenol or using a cold pack, and Plaintiff was reluctant to pursue a more aggressive form of treatment, specifically, certain prescribed medications. The ALJ also noted that Plaintiff reported migraine relief with physical therapy, muscle relaxers, and medication.

In addition to this, the Court's review of the record shows that the ALJ considered the entire medical record to find that Plaintiff's migraines were not a severe impairment at step two. Plaintiff's medical records as a whole reflect that his headaches do not have more than a minimal limitation on Plaintiff's ability to perform basic work activities. The record shows that Plaintiff often denied having headaches, stated that his treatments were relieving his headaches, and declined to pursue more aggressive prescribed medications to relieve his headaches. For example, on March 18, 2020, Plaintiff reported that his medication had "significantly decreased his headaches," and stated that he had not had a headache for 18 days. Tr. 995. About a month later, on April 23, 2020, Plaintiff reported that he had not had a headache in 10 days. Tr. 982. Several months later, on August 11, 2020, Plaintiff reported that his "headaches do feel better with recent [physical therapy] treatments." Tr. 1177. Further, the Court has reviewed all of the medical records and notes that Plaintiff either reported having no headaches or did not mention anything about headaches at several of his appointments. *See, e.g.,* Tr. 110, 686, 681, 693, 702, 704, 728, 863, 868, 1018, 1176,

1177, 1179, 1210.  For example, on January 21, 2021, Plaintiff denied any headaches.  Tr. 1210.  A few months later, on May 18, 2021, Plaintiff again denied any headaches.  Tr. 110.  And on May 26, 2021, he reported that he had been taking rizatriptan for migraine relief and it has been effective.  Tr. 104.

Further, Plaintiff testified that he has ongoing headaches and cannot work because of them.  But he also testified that on a typical day, he is on his feet for about two hours, and does "minimal chores," like getting lunch, getting the mail, helping with dishes, and washing the windows.  Tr. 125.  He testified that he also does a lot of reading, watching television, talking to his children, and trying to exercise.  *Id*.  He further testified that he traveled to Florida and spent a couple months there with his parents.  *Id*.  In January 2021, Plaintiff reported that he was exercising and performing yoga in Florida and denied any headaches.  Tr. 1210.  While he stated that he cannot watch television or have any kind of light when he gets a migraine, he testified that he spends most of his days watching television and reported in a July 2020 work history report that he can watch TV while wearing sunglasses when he has a severe headache.  Tr. 125, 131, 376.  He did not testify, for example, that he spends most of his days laying in bed with the television off and eyes closed to relieve his migraines.  There is nothing in the record that leads the Court to conclude that Plaintiff's headaches make him unable to perform basic work activities.

In sum, the record as a whole reflects that Plaintiff's headaches do not have more than a minimal limitation on his ability to perform basic work activities, and he is not significantly limited by his headaches.  There is substantial evidence in the record to support the ALJ's determination that Plaintiff's headaches are not severe.  Moreover, while

there is evidence in the record indicating Plaintiff experienced headaches, as just discussed, there is also substantial evidence in the record supporting the ALJ's conclusion that they were not a severe impairment. If it is possible to draw inconsistent conclusions from the record, and one of those conclusions represents the ALJ's findings, the ALJ's decision must be affirmed. *See Miranda T. v. Kijakazi*, No. 22-cv-708 (JRT/LIB), 2022 WL 16972540, at *2 (D. Minn. Oct. 26, 2022) (citing *Robinson v. Sullivan*, 956 F.2d 836, 838 (8th Cir. 1992); *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)), *report and recommendation adopted*, 2022 WL 16966713 (D. Minn. Nov. 16, 2022). Accordingly, the ALJ did not err in finding that Plaintiff's headaches were not a severe impairment.

### b. Step Three Analysis

Plaintiff also argues that the ALJ improperly disregarded his migraines at step three of the sequential evaluation process. Plaintiff contends that the record demonstrates that his migraines medically equal a presumptively disabling impairment listed in the regulations, and the ALJ erred by failing to address Plaintiff's migraines under that listing.

At step three of the analysis, an ALJ must consider "whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations . . . ." *David S. v. Saul*, No. 19-cv-3137 (ADM/LIB), 2021 WL 467348, at *4 (D. Minn. Jan. 25, 2021), *report and recommendation adopted*, 2021 WL 465281 (D. Minn. Feb. 9, 2021). As set forth in the regulations, the "listings" are:

> descriptions of various physical and mental illnesses and abnormalities, most of which are categorized by the body system they affect. Each impairment is defined in terms of several specific medical signs, symptoms, or laboratory test results. For a claimant to show that his impairment matches a

listing, it must meet *all* of the specified medical criteria.  An impairment that manifests only some of those criteria, no matter how severely, does not qualify. . . .

For a claimant to qualify for benefits by showing that his unlisted impairment, or combination of impairments, is 'equivalent' to a listed impairment, he must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment. . . .  A claimant cannot qualify for benefits under the 'equivalence' step by showing that the overall functional impact of his unlisted impairment or combination of impairments is as severe as that of a listed impairment. . . .

*Sullivan v. Zebley*, 493 U.S. 521, 529-32 (1990) (citations and footnotes omitted); *see* 20 C.F.R. pt. 404, subpt. P, App. 1.  "Merely being diagnosed with a condition named in a listing and meeting some of the criteria will not qualify a claimant for presumptive disability under the listing."  *McCoy v. Astrue*, 648 F.3d 605, 611-12 (8th Cir. 2011).  "An impairment that manifests only some of [the listing] criteria, no matter how severely, does not qualify."  *Id*. at 612 (quoting *Sullivan*, 493 U.S. at 530).  The claimant bears the burden of establishing that his condition meets or equals all the criteria for the listed impairment.  *Id*. at 611 (citing *Marciniak v. Shalala*, 49 F.3d 1350, 1353 (8th Cir. 1995)).

Plaintiff contends that his migraines equal the listed impairment in listing 11.02. Pl.'s Mem. in Supp. at 8.  Listing 11.02 is the listing in the regulations for the neurological disorder of epilepsy.  The regulations do not include a listing for headaches or migraines. "Social Security Ruling 19-4p, however, provides that the impairments caused by a primary headache disorder may medically equal a listed impairment, and listing 11.02 'is the most closely analogous listed impairment for [a medically determinable impairment] of a primary headache disorder.'"  *David S.*, 2021 WL 467348, at *4 n.3 (quoting Social

19

Security Ruling ("SSR") 19-4p, 2019 WL 4169635, at *7 (S.S.A. Aug. 26, 2019)). Citing *Mann v. Colvin*, 100 F. Supp. 3d 710 (N.D. Ia. 2015), *Yeatman v. Colvin*, No. 4:14-CV00255-JJV, 2014 WL 7330627 (E.D. Ark. Dec. 18, 2014), and *Theis v. Astrue*, No. 3:10CV00193 JLH, 2011 WL 2601581 (E.D. Ark. July 1, 2011), Plaintiff argues that the Court should remand this case with instructions for the ALJ to consider whether his headache disorder meets or equals listing 11.02. *See* Pl.'s Mem. in Supp. at 11.

As noted by the Commissioner, however, only headaches that are considered "primary" headaches can meet or equal listing 11.02. According to SSR 19-4p, headaches are classified as either primary or secondary headaches. 2019 WL 4169635, at *3. Primary headaches are "migraines, tension-type headaches, [or] trigeminal autonomic cephalalgias" and are "characterized by repeated exacerbations of overactivity or dysfunction of pain-sensitive structures in the head." *Id*. "Primary headaches occur independently and are not caused by another medical condition." *Id*. Secondary headaches, on the other hand, "are symptoms of another medical condition such as fever, infection, high blood pressure, stroke, or tumors." *Id*. Only primary headaches are considered a medically diagnosable impairment under listing 11.02; secondary headaches are not considered a medically diagnosable impairment under the listing. *Id*. at *5 ("We will not establish secondary headaches (for example, headache attributed to trauma or injury to the head or neck or to infection) as [medically determinable impairments] because secondary headaches are symptoms of another underlying medical condition. We evaluate the underlying medical condition as the [medically determinable impairment].").

Here, the medical records show that Plaintiff's headaches were often referred to and diagnosed as cervicogenic headaches.  *See, e.g.*, Tr. 801, 818, 856, 858-60, 867-69, 871, 876-78, 880, 885, 887, 893, 969-70, 1024, 1027, 1042, 1059, 1062, 1071, 1080, 1106, 1136, 1143, 1150, 1159, 1198, 1286.  A "[c]ervicogenic headache is a secondary headache, which means that it is caused by another illness or physical issue."  *See What is Cervicogenic Headache?*, American Migraine Foundation, https://americanmigrainefoundation.org/resource-library/cervicogenic-headache/ (last accessed Jan. 9, 2023); *see also What is a cervicogenic headache?*, MedicalNewsToday, https://www.medicalnewstoday.com/articles/324108 (last accessed Jan. 9, 2023) ("Cervicogenic headaches are secondary headaches. Secondary headaches result from an underlying condition, such as neck injuries, infections, or severe high blood pressure.").  In general, Plaintiff's doctors noted that Plaintiff's neck pain or other medical issues caused his headaches, and the headaches were therefore cervicogenic headaches.  For example, on July 8, 2019, Plaintiff's doctor noted that Plaintiff had "some neck muscle spasms *generating* [his] frequent headaches."  Tr. 887 (emphasis added).  On July 15, 2019, Plaintiff told his physical therapist that his primary care provider, Dr. Johnson, was "not convinced that [his headaches] are migraines as he has a lot of muscle tension."  Tr. 675.  Dr. Johnson noted that Plaintiff had "chronic bilateral neck and shoulder pain *with headaches*."  Tr. 881 (emphasis added).  On October 30, 2019, it was noted that Plaintiff "is struggling with arthritis in his back and neck. *This is causing chronic headaches* and neuropathy."  Tr. 618 (emphasis added).  On December 6, 2019, when Plaintiff reported to urgent care with a headache, the doctor reported that Plaintiff's back and neck pain "likely

*contributed* to his headache." Tr. 875 (emphasis added).  On December 17, 2019, Plaintiff's doctor noted that his "[n]eck is still stiff and he has cervicogenic headaches." Tr. 871.  And on March 4, 2020, Plaintiff's doctor explained that headaches and sensitivity to light and loud noises were symptoms of fibromyalgia.  Tr. 805-06.  Accordingly,  the Court agrees with the Commissioner that "much of the evidence related to headaches does not support a primary headache disorder" that could alone, or in combination with another impairment, medically equal listing 11.02.  *See* Def.'s Mem. in Supp. at 7; *see also* SSR 19-4p, 2019 WL 4169635, at *5 (explaining that secondary headaches are not considered medically diagnosable impairments because secondary headaches are symptoms of other underlying medical conditions).

Even assuming that Plaintiff's headaches are primary headaches and not secondary headaches, listing 11.02 requires Plaintiff to establish that his headaches occur "at least once a week for at least 3 consecutive months despite adherence to prescribed treatment." SSR 19-4p, 2019 WL 4169635, at *7.  In considering the severity and frequency of the headaches, the ALJ considers:

> [A] detailed description from an [acceptable medical source] of a typical headache event, including all associated phenomena (for example, premonitory symptoms, aura, duration, intensity, and accompanying symptoms); the frequency of headache events; adherence to prescribed treatment; side effects of treatment (for example, many medications used for treating a primary headache disorder can produce drowsiness, confusion, or inattention); and limitations in functioning that may be associated with the primary headache disorder or effects of its treatment, such as interference with activity during the day (for example, the need for a darkened and quiet room, having to lie down without

22

> moving, a sleep disturbance that affects daytime activities, or
> other related needs and limitations).

*Id*. Alternatively, Plaintiff can establish that his migraines occur less often, "at least once every 2 weeks for at least 3 consecutive months," if the migraines result "in marked limitation in: physical functioning; understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing oneself." *Id*.

Here, Plaintiff fails to meet his burden to show that his headaches meet listing 11.02. The ALJ's implicit finding that Plaintiff's impairments do not equal listing 11.02 is supported by substantial evidence. *See Melissa Kathleen B. v. Kijakazi*, No. 20-cv-2115 (ECT/HB), 2022 WL 447232, at *7 (D. Minn. Jan. 27, 2022) ("The ALJ did not explicitly analyze whether Plaintiff's impairments met or equaled listing 11.02 at step three, but that finding is implicit in the analysis."), *report and recommendation accepted*, 2022 WL 445822 (D. Minn. Feb. 14, 2022). There is substantial evidence that Plaintiff's migraines were not as frequent as 11.02 requires. As discussed above, Plaintiff either reported having no headaches or did not mention anything about headaches at several of his appointments. *See, e.g.,* Tr. 110, 686, 681, 693, 702, 704, 728, 863, 868, 1018, 1176, 1177, 1179, 1210. Plaintiff also reported no headaches for more lengthy periods of time. *See, e.g.*, Tr. 693 (no headaches for a week); Tr. 982 (no headaches for 10 days); Tr. 995 (no headaches for 18 days).

There is also substantial evidence that the severity of Plaintiff's headaches have improved with treatment to the extent that he has not suffered sufficiently severe migraines

that meet listing 11.02. *See Hall v. Saul*, No. 18-CV-2032-LTS-KEM, 2019 WL 5085427, at *9 (N.D. Ia. Oct. 10, 2019). Plaintiff described headache relief with Toradol injections, muscle relaxants, prescription, over-the-counter medications, and physical therapy. He reported that he can often resolve his headaches with Tylenol and a cold pack. Plaintiff also, at least initially, failed to adhere to prescribed treatment, namely, nortriptyline. *See* SSR 19-4p, 2019 WL 4169635, at *7 (considering adherence to prescribed treatment). Plaintiff's neurological examination was normal and there was no evidence of any abnormalities. Tr. 449. When Plaintiff reported headaches, other health problems were generally reported, such as back, shoulder, or neck pain, which likely caused the headaches. *See Wright v. Saul*, No. 4:19-cv-4051, 2020 WL 5819539, at *3 (W.D. Ark. Sept. 30, 2020); *Hall*, 2019 WL 5085427, at *9. Further, "the fact that [Plaintiff] often did not report headaches or migraines when receiving health care goes against finding a three-month period of sufficiently severe migraines to meet the listing, especially when [Plaintiff] reported few migraines in the latter part of the relevant time frame." *See Hall*, 2019 WL 5085427, at *9. Again, in January 2021, Plaintiff denied any headaches. Tr. 1210. In May 2021, Plaintiff reported that he had been taking rizatriptan for migraine relief and it had been effective and denied any headaches. Tr. 104, 110. Additionally, "Plaintiff does not point to a single medical appointment complicated, interrupted, or canceled due to Plaintiff's allegedly frequent, debilitating, and long-lasting migraines." *Melissa Kathleen B.*, 2022 WL 447232, at *7. Considering the entire record, "[e]ven if Plaintiff could show that [his] migraines occurred with sufficient frequency to equal listing 11.02, []he could

not carry h[is] burden of showing the headaches were sufficiently severe." *See id*. (citing *David S.*, 2021 WL 467348, at *5-6).

Although it is possible that, at times, Plaintiff experienced some headaches that were severe enough to equal the requirements of listing 11.02, "the Court does not reweigh the evidence." *See Wright*, 2020 WL 5819539, at *4 (citing *Baldwin v. Barnhart*, 349 F.3d 549, 555 (8th Cir. 2003)). Rather, the Court determines whether there is substantial evidence to support the ALJ's findings. *Id*. Here, the Court finds that there is substantial evidence in the record to support the ALJ's implicit conclusion that Plaintiff's headaches do not equal the requirements of listing 11.02. Accordingly, the ALJ did not err in failing to address Plaintiff's headaches under that listing. *See Mann*, 100 F. Supp. 3d at 718 ("Remand is not required when an ALJ fails to explain why an impairment does not meet or equal a listed impairment 'as long as the overall conclusion is supported by the record.'") (quoting *Boettcher v. Astrue*, 652 F.3d 860, 863 (8th Cir. 2011)); *see also Mulcahy v. Kijakazi*, No. 20-cv-2086-LTS, 2022 WL 8288462, at *7 (N.D. Ia. Aug. 24, 2022) (acknowledging "the Eighth Circuit's longstanding precedent that an ALJ need not explain the reasons an impairment does not equal a listed impairment as long as the ALJ's overall conclusion is supported by the record"), *report and recommendation accepted*, 2022 WL 4465554 (N.D. Ia. Sept. 26, 2022).

### c. Residual Functional Capacity Analysis

Lastly, Plaintiff contends that the ALJ's errors with respect to his headache disorder at steps two and three resulted in a failure to include limitations from his headaches in his residual functional capacity. Pl.'s Mem. in Supp. at 8-9. Plaintiff argues that the ALJ

should have considered that his headaches would cause "substantial absence from work" and "likely off-task time," and that this case should be remanded "to fully evaluate the effects of severe, lasting migraines of [Plaintiff's] ability to work." *Id.* at 14-15. In light of the Court's analysis above, the Court rejects this argument. The Court has determined that the ALJ properly considered Plaintiff's headaches at steps two and three. There is substantial evidence in the record to support the ALJ's determinations that Plaintiff's headaches are not a severe impairment and do not equal the requirements of listing 11.02. The ALJ was therefore under no obligation to include Plaintiff's purported limitations related to his headaches in the residual functional capacity assessment. *See Amy L.*, 2019 WL 4600262, at *7.

## VI. RECOMMENDATION

Based upon the record, memoranda, and proceedings herein, and for the reasons stated above, **IT IS HEREBY RECOMMENDED** that:

1. Plaintiff's Motion for Summary Judgment, ECF No. 12, be **DENIED**.

2. The Commissioner's Motion for Summary Judgment, ECF No. 19, be **GRANTED.**

Date: January ___23___, 2023                    _____*s/Tony N. Leung*_____
                                                Tony N. Leung
                                                United States Magistrate Judge
                                                District of Minnesota

                                                *Kevin J. S.. v. Kijakazi*
                                                Case No. 22-cv-147 (NEB/TNL)

26

## <u>NOTICE</u>

**Filing Objections:**  This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation.  A party may respond to those objections within 14 days after being served a copy of the objections.  LR 72.2(b)(2).  All objections and responses must comply with the word or line limits set for in LR 72.2(c).